

Barry Coburn
202-470-1689
barry@coburngreenbaum.com

November 8, 2017

By ECF

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Aaron Davidson, et al.*, Criminal Docket No. 15-252 (PKC) and *United States v. Jose Hawilla, et al.*, Criminal Docket No. 14-609 (PKC)

Dear Judge Chen:

      We represent Marcelo Radice, Miguel Pazcabrales, and Matthew Neidl, former employees of Traffic Sports USA, Inc.  We have been corresponding with the government concerning our submission that our clients are victims under the Mandatory Victims Restitution Act, codified at 18 U.S.C. § 3663A, with regard to the fraudulent conduct of the defendants in the above-captioned cases.  Attached is a letter that we submitted to both the United States Attorney's Office for the Eastern District of New York as well as the United States Probation Department.[1]  The letter delineates our arguments in support of our position that our clients are entitled to relief under the MVRA.

      Whether our clients are victims is the threshold issue.  However, with respect to the amount of restitution, our clients would seek to recover, at a minimum, a year's worth of salary plus some semblance of the projected commissions they were to receive under the various projects they had pending that were lost as a result of the defendants' actions.  If the Court deems that our clients are victims and are entitled to recover restitution, we would gladly provide the Court additional information supporting a particular restitution amount.

---

[1] The letter to the Probation Office and the United States Attorney's Office are identical except for the addressees.  We sent the same letter to the Probation Office on September 6, 2017.

Application for Restitution by Marcelo Radice, Miguel Pazcabrales, and Matthew Neidl
Page 2
_____

      Given that Mr. Davidson's sentencing hearing is set for November 20, 2017, we respectfully submit this notice and the attached letter for the Court's consideration as to whether our clients may be deemed victims and recover under the MVRA.

      Respectfully submitted,


      */s/ Barry Coburn*

      Barry Coburn

# Exhibit A

# Coburn & Greenbaum
### PLLC

Lloyd Liu
202-470-1689
lloyd@coburngreenbaum.com

September 6, 2017

Paul Tuchmann, Esq.
United States Attorney's Office
for the Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-6294

Via electronic mail

Re: MVRA claim on behalf of former Traffic Sports employees

Dear Mr. Tuchmann:

Marcelo Radice, Miguel Pazcabrales, and Matthew Neidl are former members of the sales team for Traffic Sports USA. We are submitting this letter on their behalf, seeking to recognize them as victims of the criminal conduct of Aaron Davidson, Traffic Sports, and others and to request restitution.

In 2015, the Department of Justice unearthed a longstanding and pervasive bribery scheme at the highest levels of FIFA. FIFA submitted a victim impact statement and a request for restitution caused by the defendants' conduct. FIFA has claimed damage to its reputation and business relationships, as well as large financial losses in the form of salaries or benefits paid to the defendants as well as funds that were diverted from their intended uses. Large institutions, like FIFA, CONCACAF and CONMEBOL, are routinely recognized as victims where their employees or agents engage in criminal conduct.

Our clients present the other side of the coin, perhaps oft overlooked when considering who the victims are. Mssrs. Radice, Pazcabrales, and Neidl joined Traffic Sports USA, after years working in the sports marketing industry, for the opportunity to get involved with the most prestigious soccer properties in the Americas. They joined largely because they believed and understood that Traffic Sports USA had legitimately obtained the marketing rights to the most lucrative soccer tournaments in the North and South American regions. Of course, as we now know, those properties were the product of criminal conduct, and as a result of that and no fault of theirs, our clients lost their jobs and suffered damaged reputations.

Application for Restitution by Marcelo Radice, Miguel Pazcabrales, and Matthew Neidl
Page 2

## BACKGROUND

As this office is well aware, FIFA, the Fédération Internationale de Football Association, is the international governing body of football. It is divided into six regional confederations: Africa, Asia, Europe, North and Central America and the Caribbean, Oceania, and South America. FIFA is responsible for promoting tournaments. Its most notable one is the World Cup. FIFA delegates the organization of tournaments to its regional confederations.

The Confederation of North, Central America and Caribbean Association Football is known as CONCACAF. The confederation that governs the South America Region is known as CONMEBOL, standing for Confederación Sudamericana de Fútbol. Both CONCACAF and CONMEBOL are responsible for awarding marketing rights to their respective tournaments. For CONCACAF, its most visible tournaments include the CONCACAF Gold Cup and the CONCACAF Champions League. These tournaments are significant and generate immense revenue through various means, including advertising and marketing rights. The same is true for CONMEBOL's tournaments. CONMEBOL's most prominent tournament is the Copa América.

Traffic Sports USA, Inc. ("Traffic Sports USA") was a Florida company involved in purchasing and selling media and marketing rights associated with soccer in the United States and in the CONCACAF and CONMEBOL regions.

Traffic Sports USA was the US office and was an affiliate of Traffic Sports International, Inc. ("Traffic Sports International"), based in Brazil. Jose Hawilla was the chief executive officer of Traffic Sports International.

Aaron Davidson was the President of Traffic Sports USA. Under Davidson, Traffic Sports USA flourished. As it would later turn out, Traffic Sports succeeded because Davidson and Hawilla were bribing organizations, both CONCACAF and CONMEBOL, to secure deals to sell television and sponsorship rights. These were lucrative, massive multi-million-dollar television contract rights, and seven figure sponsorship rights, awarded to Traffic Sports through bribes.

In 2015, the government indicted top executives of FIFA on charges of a widespread and rampant bribery and kickback scheme. The scheme was breathtaking in scope: in May 2015, the government indicted fourteen then-current and former FIFA officials and associates. Then in December of the same year, sixteen more officials were charged. The scheme involved losses in the amounts of hundreds of millions of dollars, including amounts paid in bribes and salaries paid to corrupt individuals. The defendants also are charged with conspiring to conceal the bribery scheme through various methods. Jose Hawilla, Aaron Davidson, Traffic Sports and Traffic Sports International are named as defendants in the conspiracy. Hawilla and Davidson pleaded guilty to numerous charges and are awaiting sentencing.

1710 Rhode Island Avenue, NW · 2nd Floor · Washington DC 20036
202.657.4490 · fax 866.561.9712 · coburngreenbaum.com

At the time Traffic Sports was indicted, Mr. Radice and his colleagues had secured several high value contracts with potential sponsors for the 2015 CONCACAF Gold Cup and Scotiabank Champions League, and Copa America Chile 2015. The indictment caused many sponsors to withdraw. Prior to their withdrawal, the total amount of secured sponsorships for Gold Cup was valued around $11.5 million. The sponsors with whom Mr. Radice and his colleagues negotiated included AB InBev, Delta Air Lines, Gatorade, Coca-Cola, McDonald's, Scotia Bank, and others. At this time, early negotiations had begun for the first ever Copa America Centenario to be hosted in the United States in July 2016. With the exception of one sponsor of Copa America 2015, all of the incumbent sponsors had expressed interest to begin negotiations and first option rights to Copa America Centenario. This was the first tournament to combine sixteen teams from CONMEBOL and CONCACAF, representing more than $60 million in sponsorship revenue potential.

The indictment of Traffic Sports caused all CONCACAF and Copa America Centenario 2016 contracts to be rescinded and the end of the business. Once Traffic Sports top executives were indicted and this information became public, Radice, Pazcabrales, and Neidl were eventually terminated within months. Since their respective terminations, they have each struggled to rehabilitate their reputations and re-establish themselves professionally in the sports and soccer marketing industries.

## STANDARD

The MVRA requires sentencing courts to order restitution for certain crimes, such as an offense against property under this title . . . including any offense committed by fraud and deceit," and where an identifiable victim has suffered pecuniary loss. 18 U.S.C. § 3663A(a)(1). The goal of restitution in the criminal context is to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury." *United States v. Battista*, 575 F.3d 226, 229 (2d Cir. 2009).

The statute defines "victim" broadly, as any:

> Person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).

Application for Restitution by Marcelo Radice, Miguel Pazcabrales, and Matthew Neidl
Page 4

---

The MVRA's definition of "victim" tracks identically the definition of "victim" in the Victim Witness Protection Act (the "VWPA"). 18 U.S.C. § 3663(a)(2). The general discretionary restitution statute that preceded and was partially superseded by the MVRA.

In particular, both the MVRA and the VWPA, as amended, require identical causation standards – *i.e.*, the victim's harm must be "directly and proximately" caused by the defendant's criminal activity. The Second Circuit summarized Congress's grant of authority to courts to impose restitution as follows:

> [S]ince 1982 when it authorized federal courts to impose restitution Congress has: (i) broadened this authority by, *inter alia*, allowing restitution for victims who directly suffered harm from crimes involving conspiracy or a criminal scheme, and allowing restitution for crimes pled in a plea agreement; (ii) made restitution mandatory for certain crimes; (iii) imposed a "direct and proximate" causation standard as to both discretionary and mandatory restitution; and (iv) remained insistent that restitution determinations not unduly prolong sentencing proceedings.

*United States v. Marino*, 654 F.3d 310, 319 (2d Cir. 2011).

## ARGUMENT

Our clients relied on Traffic Sports USA's representations that they had lawfully obtained the marketing rights to CONCACAF and CONMEBOL tournaments. Had it not been for that, our clients would not have joined the company. As we describe below, Traffic Sports USA's concealment was a direct cause of the losses suffered by our clients.

### *Marcelo Radice*

With respect to Mr. Radice, Aaron Davidson personally asked Mr. Radice to join Traffic Sports. He told Mr. Radice that Traffic Sports had agreements with CONCACAF and CONMEBOL and that these were exclusive properties. Mr. Radice had long been seeking to return into the professional soccer marketing space. He had played soccer in college and then, later, abroad in Germany. He eventually returned to the United States and finished his college degree. He then obtained his MBA. For the next 20 years, Mr. Radice worked in sponsorship marketing for companies such as L'Oreal, Mastercard, and Allegro Resorts Marketing. Aaron Davidson's offer to work with CONCACAF was irresistible, allowing Mr. Radice to fulfill a desire to return back to soccer sponsorship marketing, an area where he had acquired significant expertise.

Traffic Sports had secured the exclusive sponsorship rights with CONCACAF and CONMEBOL through 2023. That is why Mr. Radice decided to shift his career into the professional soccer

market. Without it, the move would not have been worth it. It would have been too risky, and at the time, he had other, more stable opportunities.

### Miguel Pazcabrales

Mr. Pazcabrales attended primary and secondary school in Mexico City, Mexico before going to Miami, Florida to attend high school in the late '90s. After high school, he attended and graduated college from Florida International University. While at FIU, Mr. Pazcabrales started Mexisport Media, LLC, which published a weekly sports publication titled "La Cascarita," directed to Hispanic readers in Florida, North Carolina, Los Angeles, and New York City. This is where he started to engage in sports media, and served as the springboard for him to enter sports marketing.

Traffic Sports was his first start in soccer marketing, after completing his post-graduate education in sports management in Barcelona, Spain. Like Mr. Radice, once at Traffic Sports, Mr. Pazcabrales was responsible for selling sponsorship packages to companies of all sizes. Again, like Mr. Radice, Mr. Pazcabrales worked on the CONCACAF properties. His ties with the Mexican La Liga clubs would turn out to be instrumental in building relationships with Mexican sponsors and landing the most important sponsorship partnership for CONCACAF with Scotiabank.

### Matthew Neidl

Mr. Neidl has been involved in various forms of sports marketing since the early 2000s. He received his undergraduate degree in business management and marketing communication from the Universidad San Francisco de Quito in Quito, Ecuador. From there, he started his own marketing company for several years, and was later hired by one of the premier sports marketing agencies, Octagon Sports, as Group Director of Multicultral Marketing.

Mr. Neidl joined Traffic Sports in 2013. Traffic Sports told Mr. Neidl when he was hired that all the soccer properties and platform were acquired via requests for bids and negotiations performed directly with soccer federations. As noted above, the Traffic Sports indictment resulted in the dissolution of almost all agreements. As was the case with others on the sales team, Mr. Neidl was compensated in large part on commissions. After the sponsors backed out of their agreements, those potential commissions dissipated.

### Analysis

It was a critical part of Traffic Sports' conspiracy to conceal the nature of the bribes paid to various officials. The nature of the concealment is evident from the indictment of Traffic Sports and Mr. Davidson: "The conspirators engaged in conduct designed to prevent detection of their

Application for Restitution by Marcelo Radice, Miguel Pazcabrales, and Matthew Neidl
Page 6

illegal activities, to conceal the location of proceeds of those activities, and to promote the carrying on of those activities." Hawilla Information, ¶ 51. The conduct by the various members of the conspiracy included the "use of contracts to create an appearance of legitimacy for illicit payments" and the "active concealment of foreign bank accounts." *Id.*

These bribes granted Traffic Sports the exclusive marketing/sponsorship rights to the most prominent properties of CONCACAF and CONMEBOL, including the CONCACAF Champions League and Gold Cup, and the CONMEBOL Copa América Centenario, Copa America Brazil 2019, and Copa America Ecuador 2013.

When Traffic Sports, Jose Hawilla, and Aaron Davidson were indicted, our clients were displaced from their jobs. They suffered reputational harm for being associated with Traffic Sports, Hawilla, and Davidson. Mr. Radice recalls that an executive at Western Union told him, "Traffic Sports is like the plague. We cannot mention that word right now." Another executive from an agency that represented McDonald's told Mr. Radice that McDonald's would not touch the property anymore, and representatives from Gatorade and Pepsi informed Mr. Radice that their respective legal departments instructed them to cease all contact with Traffic Sports until further notice. A representative of Visa International told Mr. Radice that "as long as Traffic remains involved in selling the commercial rights of these soccer properties, including the World Cup Qualifiers for CONCACAF and CONMEBOL, they would pass and not invest."

The fallout hit each of our clients individually. Radice, Pazcabrales, and Neidl were sports marketers, specifically dedicated to the soccer sponsorship world, arguably among the largest sporting events in the world. They invested years in this industry and traded on their reputations. Mr. Radice, for example, recalls being told by other potential employers and partners that they did not want to deal with the "retreads from Traffic." Mr. Radice applied for numerous positions with companies such as Amazon, Adidas, Puma, Under Armour, Repucom, Visa International, FIFA, American Express, AIG, Subway, Capital One, Citibank, and Wells Fargo, among others. He did not receive a single interview, even though he had applied to positions equivalent to the same position he had held at MasterCard ten years earlier. Mr. Radice learned from individuals at Visa and MasterCard that his employment with Traffic Sports disqualified him from consideration.

Even within this year, Mr. Radice learned from a former business partner at MasterCard that the company would not work with or hire any employees associated with Traffic Sports.

The harm suffered by our clients is both pernicious and overt. The reputational harm and the possibility of being blacklisted from the industry is a subtler harm, one that is observed from inferences and circumstance. The displacement from their jobs and their termination are more overt. The question then turns to causation, and whether, under this Circuit's law, the

Application for Restitution by Marcelo Radice, Miguel Pazcabrales, and Matthew Neidl
Page 7

defendants, particularly Traffic Sports, Mr. Davidson, and Hawilla, proximately caused this harm within the meaning of the MVRA.

The Second Circuit's decision in *United States v. Marino* is instructive. In *Marino*, the defendant was charged in connection with his participation in a Ponzi scheme. The defendant pleaded guilty, but appealed the district court's determination with respect to who constitutes a victim under the MVRA. At issue was whether investors in the fund were victims with respect to the defendant's actions. In *Marino*, the defendant was accused of concealing the Ponzi scheme, and the defendant argued that his concealment was not a direct cause of the investor's losses because he was not engaged in the operational activity of the fraud, *e.g.* trading, investment, or other related financial activity.

The Second Circuit in *Marino* engaged in a lengthy discussion of the proximate causation requirement under the MVRA. It began by noting that the proximate causation requirement "promotes efficiency in the sentencing process by 'limiting a person's responsibility for the consequences of that person's own acts." The court then began addressing the defendant's two causation arguments on appeal: (1) that his actions were not a "but for" cause of the investors' harm; and (2) that his actions were not a "proximate cause." The Second Circuit rejected both arguments.

First, with the "but for" argument, the court began by noting that the "very nature of the crime – concealment – indicates the harm deemed to result from public ignorance in the securities fraud context." *Id.* at 322. Had the defendant "disclosed the crime in a timely fashion, no investor would have invested fresh cash in the Ponzi." As a result, the court rejected the defendant's claim that his crime was not a cause in fact. *Id.*

Second, as to the proximate cause argument, the defendant argued that he was not a proximate cause as to the investors' harm because of the "wantonly fraudulent" conduct of others. *Id.* at 323. Further, the defendant argued that he could not have foreseen the extent of the losses that the firm was incurring. Again, the Second Circuit rejected each of these arguments. The court concluded that it was clear that the defendant was aware that the investors were depending on his representations. With respect to the defendant's argument that his actions were less harmful than that of others, the court found "[w]hether they were less serious than the actions of [other co-conspirators] is essentially irrelevant because, during the period of appellant's criminal activity, his acts were essential to the [co-conspirator's] criminal scheme. *Id.* at 324.

As for foreseeability, the court found that the defendant knew first-hand "the amounts the victims had at stake in the Bayou fraud," and that "[n]o reasonable person in his position could have failed to foresee that the victims who invested in Bayou from January through August of 2005 would ultimately face substantial or even complete loss of their investment." *Id.*

1710 Rhode Island Avenue, NW · 2nd Floor · Washington DC 20036
202.657.4490 · fax 866.561.9712 · coburngreenbaum.com

We submit that *Marino* supports the conclusion that our clients are victims within the meaning of the MVRA. Our clients joined Traffic Sports specifically because Traffic Sports represented that it legitimately held commercial sponsorship rights to CONCACAF and CONMEBOL. Our clients understood and were led to believe that it was an above-board relationship. As a result, they committed themselves for years to Traffic Sports, unknowingly pursuing their professional objectives under completely false pretenses. Mr. Davidson and those at Traffic Sports who were part of the conspiracy knew that our clients were staking their reputations on this enterprise, not knowing that the rights they were trading had been procured by illicit activity.

We emphasize the fraudulent nature in which our clients were induced because it informs and reinforces the causal relationship between Aaron Davidson's criminal actions and the harm suffered. It is significant to the causal relationship and informs it because we submit that our clients would have a private cause of action against Traffic Sports in these circumstances. Whether or not they have a private cause of action is a factor for a court to consider. The *Marino* court articulated this point when analyzing its own precedent, *United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006): "What *Reifler* means is that where an analogous private right of action, case law under it may inform, but perhaps not control, causation determinations in restitution proceedings." *Marino*, 654 F.3d at 321. The presence here of a potential private right of action weighs in favor of finding that our clients were proximately harmed by Traffic Sports' criminal conduct.

When Radice, Pazcabrales, and Neidl lost their jobs, they lost their salary, entitlement to commissions, and benefits. The foreseeability of these damages to Aaron Davidson and Traffic Sports is evident. By way of context, the majority of Radice, Pazcabrales, and Neidl's compensation came from commissions. Their base salaries were anywhere from $60,000 to $150,000. On top of their base salaries, they would earn anywhere from 2.5 to 5% in commissions depending on what properties they were selling.

Accordingly, we respectfully submit that Mssrs. Radice, Pazcabrales, and Neidl be deemed victims under the MVRA and be awarded restitution.

Sincerely,

Lloyd Liu