LAW OFFICES

## Jacobs and Bell

A PROFESSIONAL ASSOCIATION

RAPHAEL G. JACOBS
ALLEN M. BELL

19 ENGLE STREET
TENAFLY, NEW JERSEY 07670
(201) 568-2200
--------
FAX: (201) 568-9570
EMAIL: lawfirm@jacobsandbell.com

**VIA FEDERAL EXPRESS**

June 10, 2019

Honorable Pamela K. Chen
Judge, District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE:   United States v. Jose Hawilla, Traffic Sports USA Inc., and Traffic Sports
International Inc.
Docket No.: 14-CR-609 (PKC)

Dear Judge Chen:

Please accept this letter memorandum in response to the United States Attorney's May
29th letter opposition to the request for restitution filed by Innovative Sports Marketing.

We believe that the United States Attorney has viewed the statute, 18 USC sec.
3663(a)(1)A, far too narrowly with respect to the victims who are entitled to restitution.
The case cited by the government, **United States v. Reifler**, 446 F,3d 65 (2d Cir. 2006)
concerned a specific conspiracy to artificially inflate the price of a publicly traded stock
in order to permit one of the conspirators to sell his shares at a profit. The court found
that the losses by the parties seeking restitution was not attributable to the conspiracy.

However, in the instant case, in addition to charges for conspiracy, wire fraud, money
laundering and obstruction of justice, Traffic was also alleged to have participated in a
"pattern of racketeering activity and "multiple acts involving bribery." See United States
v. Hawilla, Information, pages 52 and 53, annexed hereto.

The restitution statute provides that a "victim" includes a person directly and proximately
harmed as a result of criminal conduct in the course of a "pattern of criminal activity."

Page 2
June 10, 2019
US v Hawilla, et al.

During Chuck Blazer's guilty plea hearing, he acknowledged that he had accepted bribes and kickbacks for broadcast rights beginning in 1993 and continuing through the early 2000s. He specifically mentioned rights to games in 1996, 1998, 2000, 2002 and 2003. See United States v. Blazer, Sealed Proceedings, T31-1 through 4, annexed hereto. These were the exact same dates alleged in the information filed against Traffic. See United States v. Hawilla, pages 43 and 44, par 96 and 97. Thus, this pattern of bribery of Blazer by Traffic was ongoing during the time period that Innovative Sports Marketing was seeking the broadcast rights to the Concacaf Olympic Qualifying tournament.

While the broadcast rights to the Olympic Qualifying matches were not specifically mentioned in the charges against Traffic, there is little doubt that Traffic's securing of those rights were based on a bribery paid to Chuck Blazer as part of the pattern of criminal activity described in Count One (Racketeering Conspiracy) of the Information filed against Traffic. "Victim restitution may be ordered for criminal conduct that is part of a broad scheme to defraud, without regard to whether the defendant is convicted for each fraudulent act in the scheme...." **United States v. Ross**, 279 F.3d 600, 609 (8th Cir.2002) In **United States v. Johnson**, 440 F.3d 832, 850 (6th Cir. 2006) the Court noted that the "district court could therefore award restitution to any victim harmed by the defendant's criminal conduct in the course of the RICO activity." See also, Innovative Sports Marketing Victim Statement previously filed.

For the reasons set forth above, this Court should recognize Innovative Sports Marketing as a victim entitled to restitution for the loss sustained as a direct result of Traffic's pattern of criminal activity.

Respectfully,

Raphael G. Jacobs

RGJ/tp
Encl.
cc:  Mr. Samuel Nitze (USANYE), via email
     Mr. Douglas Jacobs (ISM), via email

DSS:EMN/AH/DAL/SPN/BDM
F.#2014R00190

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

JOSÉ HAWILLA,
TRAFFIC SPORTS USA, INC., and
TRAFFIC SPORTS INTERNATIONAL, INC.,

           Defendants.

I N F O R M A T I O N

Cr. No. 14-609 (RJD)
(T. 18, U.S.C., §§
981(a)(1)(C), 982(a)(1),
982(b), 1349, 1512(b)(3),
1512(c)(2), 1956(h),
1962(d), 1963, 1963(a),
1963(m) and 3551 et seq.;
T. 21, U.S.C., § 853(p);
T. 28, U.S.C. § 2461(c))

- - - - - - - - - - - - - - - - - -X

THE UNITED STATES ATTORNEY CHARGES:

## INTRODUCTION TO ALL COUNTS

    At all times relevant to this Information, unless otherwise indicated:

I.   The Enterprise

    1.   The Fédération Internationale de Football Association ("FIFA") and its six constituent continental confederations – the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC") –

due on or about April 3, 2014.  International wire transfer
records confirm the payment:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| April 1, 2014 | Wire transfer of $6,999,950 from Datisa's account at Banco Hapoalim Ltd. in Zurich, Switzerland, to a JP Morgan Chase account in Miami, Florida in the name of CONCACAF. |

B.   CONCACAF Gold Cup Bribery Scheme

95.  In or about 1991, CONCACAF began organizing and
promoting the Gold Cup, a tournament featuring member nations of
CONCACAF and, in later years, those of other confederations.

96.  In or about 1992, HAWILLA relocated to the United
States for various reasons, including to seek additional
business opportunities for Traffic's United States affiliate in
the period leading up to the 1994 World Cup.  During this
period, HAWILLA and Co-Conspirator #10, a TRAFFIC USA executive
based in Miami, variously began negotiations with high-ranking
CONCACAF officials, including Co-Conspirator #11 and Co-
Conspirator #12, for TRAFFIC USA to purchase the media and
marketing rights associated with the Gold Cup.  HAWILLA's pitch
to CONCACAF, in sum and substance, was that Traffic could
replicate the commercial and sporting success it had had with
the Copa América and make the Gold Cup a similar success.  On or
about October 3, 1994, TRAFFIC USA entered into a contract with

43

CONCACAF for $9,750,000 for the commercial rights associated with the 1996, 1998, and 2000 editions of the Gold Cup.

97. Beginning with the 1996 Gold Cup and continuing for four subsequent editions of the tournament (1998, 2000, 2002, and 2003), pursuant to the contract with TRAFFIC USA (as subsequently amended and renewed following additional negotiations), CONCACAF granted to TRAFFIC USA the exclusive worldwide commercial rights to the Gold Cup.

98. During this period, HAWILLA and Co-Conspirator #10 together caused hundreds of thousands of dollars in bribe payments to be made to Co-Conspirator #11 and Co-Conspirator #12.

99. Traffic did not hold the media and marketing rights associated with the Gold Cup for the 2005, 2007, 2009, and 2011 editions.

100. In 2011, Co-Conspirator #11 and Co-Conspirator #12 resigned from CONCACAF and were ultimately replaced the following year by two other high-ranking officials, Co-Conspirator #8 and Co-Conspirator #9.

101. Co-Conspirator #9, the former employee of TRAFFIC USA, entered into negotiations with TRAFFIC USA for the commercial rights associated with the 2013 Gold Cup. Co-Conspirator #7 was involved in those negotiations on behalf of

44

schemes was made to the FIFA or CONCACAF executive committee or congress.

## COUNT ONE
### (Racketeering Conspiracy)

121. The allegations contained in paragraphs 1 through 120 are realleged and incorporated as if fully set forth in this paragraph.

122. In or about and between January 1991 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSÉ HAWILLA, together with others, being a person employed by and associated with the enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of such enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

123. The pattern of racketeering activity through which the defendant JOSÉ HAWILLA, together with others, agreed to conduct and participate, directly and indirectly, in the

conduct of the affairs of the enterprise consisted of multiple

acts indictable under:

> (a) Title 18, United States Code, Section 1343
> (wire fraud, including honest-services wire
> fraud);
>
> (b) Title 18, United States Code, Sections 1956
> and 1957 (money laundering and money
> laundering conspiracy);
>
> (c) Title 18, United States Code, Section 1952
> (interstate and foreign travel in-aid-of
> racketeering); and
>
> (d) Title 18, United States Code, Section 1512
> (obstruction of justice);

and multiple acts involving bribery, in violation of New York

State Penal Law Sections 180.03 and 180.08.  HAWILLA agreed that

a conspirator would commit at least two acts of racketeering

activity in the conduct of the affairs of the enterprise, the

last of which would occur within 10 years of a prior act of

racketeering activity.

(Title 18, United States Code, Sections 1962(d), 1963

and 3551 et seq.)

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA      :    13-CR-602 (RJD)
 4                                      13-MC-1011

 5       -against-                      U.S. Courthouse

 6                                 :    Brooklyn, New York

     CHARLES GORDON BLAZER
 7                                      SEALED PROCEEDING
                     Defendant     :
 8                                      November 25, 2013
     - - - - - - - - - - - - - - X      10:00 a.m.
 9

10   BEFORE:
             HONORABLE RAYMOND J. DEARIE
11           United States District Judge

12

13   APPEARANCES:

14   For the Government:      LORETTA E. LYNCH
                              United States Attorney
15                            271 Cadman Plaza East
                              Brooklyn, New York 11201
16                            BY:  EVAN NORRIS
                                   DARREN LaVERNE
17                                 AMANDA HECTOR
                                   Assistant U.S. Attorneys
18

19

20   For the Defendant:      FRIEDMAN KAPLAN SEILER
                             & ADELMAN LLP
21                           7 Times Square
                             New York, New York 10036-6516
22                           BY:  ERIC CORNGOLD
                                  MARY E. MULLIGAN
23                                ELIZABETH LOSEY
                                      AND
24                                STUART FRIEDMAN

25
```

U.S.A. v. CHARLES BLAZER                                    29

1          THE DEFENDANT:  Yes, I am.

2          THE COURT:  Of your own free will?

3          THE DEFENDANT:  Totally.

4          THE COURT:  Has anybody forced you to plead guilty?

5          THE DEFENDANT:  No.

6          THE COURT:  Has anybody made a promise to you that

7   is not reflected in this agreement?

8          THE DEFENDANT:  No.

9          THE COURT:  Has anybody given you any assurance as

10  to what I will do when it comes to sentence?

11         THE DEFENDANT:  No.

12         THE COURT:  We turn to the charges.  Has an

13  allocution been prepared?

14         MR. CORNGOLD:  Yes, Your Honor.

15         THE COURT:  Why don't we start with that and then we

16  will go from there.

17         MR. CORNGOLD:  We have done it count by count.

18         THE COURT:  Even better.

19         Mr. Blazer, tell me what you did.

20         THE DEFENDANT:  Regarding Count One.

21         From in and about and between 1990 to December 2011,

22  I was employed by and associated with the Federation

23  Internationale de Football Association, commonly known as

24  FIFA, and one of its constituent confederations, the

25  Confederation of North, Central American and Caribbean

1  | Association Football, commonly known as CONCACAF, and their

2  | sports marketing affiliates.

3  |           During this time, the principal purpose of FIFA and

4  | CONCACAF, as well as other affiliated soccer governing bodies

5  | and sports marketing companies, was to promote and/or regulate

6  | the sport of soccer worldwide as part of an ongoing

7  | organization.  Among other things, FIFA and CONCACAF held

8  | sports-related events and conducted business overseas and in

9  | the United States, including in the Eastern District of New

10 | York, and utilized American financial institutions in their

11 | banking and investment activities.  CONCACAF also had its

12 | headquarters in New York.

13 |           From 1997 through 2013, I served as a FIFA executive

14 | committee member.  One of my responsibilities in that role was

15 | participating in the selection of the host countries for the

16 | World Cup.  I also served as General Secretary of CONCACAF

17 | from 1990 through December of 2011, and was responsible for,

18 | among other things, participating in the negotiations for

19 | sponsorship and media rights.

20 |           During my association with FIFA and CONCACAF, among

21 | other things, I and others agreed that I or a co-conspirator

22 | would commit at least two acts of racketeering activity.

23 | Among other things, I agreed with other persons in or around

24 | 1992 to facilitate the acceptance of a bribe in conjunction

25 | with the selection of the host nation for the 1998 World Cup.

U.S.A. v. CHARLES BLAZER                                      31

1    Beginning in or about 1993 and continuing through the early

2    2000s, I and others agreed to accept bribes and kickbacks in

3    conjunction with the broadcast and other rights to the 1996,

4    1998, 2000, 2002, and 2003 Gold Cups.  Beginning in or around

5    2004 and continuing through 2011, I and others on the FIFA

6    executive committee agreed to accept bribes in conjunction

7    with the selection of South Africa as the host nation for the

8    2010 World Cup.  Among other things, my actions described

9    above had common participants and results.

10           That is with regard to Count One.

11           THE COURT:  All right.

12           Go ahead.

13           THE DEFENDANT:  Count Two.

14           Between April of 2004 and May 2011, I and others who

15   were fiduciaries to both FIFA and CONCACAF, in contravention

16   of our duties, I and others, while acting in our official

17   capacities, agreed to participate in a scheme to defraud FIFA

18   and CONCACAF of the right to honest services by taking

19   undisclosed bribes.  I and others agreed to use e-mail,

20   telephone, and a wire transfer into and out of the United

21   States in furtherance of the scheme.  Funds procured through

22   these improper payments passed through JFK Airport in the form

23   of a check.

24           That is regarding Count Two.

25           Number three.

1      THE COURT:  Okay.

2      THE DEFENDANT:  Number three.

3      Between December 2008 and May 2011, I and others

4 agreed to and transmitted funds by wire transfer and checks

5 from places within the United States to places in the

6 Caribbean, and from places in the Caribbean to places in the

7 United States.  I agreed to and took these actions to, among

8 other things, promote and conceal my receipt of bribes and

9 kickbacks.  I knew that the funds involved were the proceeds

10 of an unlawful bribe, and I and others used wires, e-mails,

11 and telephone to effectuate payment of and conceal the nature

12 of the bribe.  Funds procured through these improper payments

13 passed through JFK Airport in the form of a check.

14      Regarding Counts Four through Nine.

15      Between 2005 and 2010, while a resident of New York,

16 New York, I knowingly and wilfully failed to file an income

17 tax return and failed to pay income taxes.  In this way, I

18 intentionally concealed my true income from the IRS, thereby

19 defrauding the IRS of income tax owed.  I knew that my actions

20 were wrong at the time.

21      THE COURT:  Repeat that again.

22      THE DEFENDANT:  Between 2005 and 2010, while a

23 resident of New York, New York, I knowingly and willfully

24 failed to file an income tax return and failed to pay income

25 taxes.  In this way, I intentionally concealed my true income